# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

Gina Medico,

     **Plaintiff,**

v.

Connecticut Coalition Against Domestic Violence, Inc.
The Center for Family Justice, Inc.,
Hearst Media Services Connecticut, LLC,
Narc Free Press, LLC
Connecticut Protective Moms, Inc.
a/k/a Protective Moms, Inc.,
One Mom's Battle, LLC
Akin Gump Strauss Hauer & Feld, LLP,
Neubert, Pepe & Monteith, P.C.
Suzanne Campos, Christine Cocchiola,
Amy Polacko, Lisa Aronson Fontes,
Tina Swithin, Anne Marcone,
Ramani Durvasula, Clare Dignan,
Betsy Keller, Kimberly Donohue,
Emily Goodman, Esquire,
James Brownstein, Esquire, Angie DiDomenico,
Marc Fitch, John Does 1-10,
Jane Does 1-10 and, XYZ Stakeholders 1-10,
Each Defendant is sued in their individual
capacity, and, to the extent applicable,
in their official capacity, and is jointly and
severally liable for the conduct described herein.

     **Defendants.**                                       ***TRIAL BY JURY DEMANDED***

## COMPLAINT FOR DAMAGES
### AND INJUNCTIVE RELIEF UNDER RICO (18 U.S.C. §§ 1962(a)-(d)),
### COPYRIGHT ACT, VAWA, AND RELATED STATE-LAW CLAIMS

I.    <u>**NATURE OF THE ACTION**</u>

     Plaintiff, Gina Medico, brings this action for damages against a coordinated network of

individuals and entities who, acting jointly and severally, conspired to and exploit, defraud,

defame, harass, intentionally exclude, isolate, and prey upon her. These defendants colluded to

disseminate malicious lies about Plaintiff's character, to wrongfully terminate her employment,

and to obstruct her nonprofit advocacy work focused on domestic abuse/violence and child-abuse survivors. Their conduct was designed to appropriate and reframe Plaintiff's Original Personal Story, academic research, Intellectual Property, publicly presented advocacy work, interviews, programmatic materials, and survivor-focused language—protected forms of speech and proprietary content—and convert that work for their own benefit. Defendants repackaged Plaintiff's work into derivative exposés, articles, books, videos, interviews, campaigns, political advocacy efforts, workshops, and training programs offered for sale and distribution, seeking personal recognition, charitable funding, profits, and professional acclaim while interfering with Plaintiff's occupation and plundering her nonprofit, Sweet Corner Girl Corp.

**<u>Culpable Persons</u>**

The defendants named in this action qualify as culpable persons under the RICO statute, as they are individuals and entities capable of holding a legal or beneficial interest in property. The defendants named herein engaged in a pattern of racketeering activity, including surveillance, exploitation, stalking, coordinated pervasive cyberstalking, defamation, obstruction of justice, witness intimidation, wire fraud, mail fraud, intentional exclusion, and retaliation, thereby violating the Civil RICO statute, 18 U.S.C. § 1962, RICO § 1962(c) Corrupt Organizations and Racketeering and Activity Act (C.O.R.A.) (C.G.S. § 53-395) and further contravening protections under the Violence Against Women Act (VAWA), 34 U.S.C. § 12291 et seq., STALKING AND RETALIATION 34 U.S.C. § 12291(a)(1)(A), (2022 REAUTH.)and CONN. GEN. STAT. § 46a-60(b)(4).

To the extent Connecticut's Corrupt Organizations and Racketeering Act (C.G.S. § 53-395 et seq.) defines criminal racketeering conduct analogous to the federal RICO scheme, Plaintiff cites such conduct solely as evidence of Defendants' racketeering activity. Plaintiff

does *not* assert an independent cause of action under C.O.R.A., as Connecticut law does not create a private right of action.

**Enterprise**

The enterprise alleged in this action is a decentralized network of individuals and entities, associates-in-fact, including attorneys, media organizations, nonprofit advocacy groups, for-profit advocacy groups, stakeholders, sponsors, investors, and other collaborators, who coordinated their actions to further a common unlawful purpose. The enterprise is not a single legal entity, but an association-in-fact enterprise as defined under 18 U.S.C. § 1961(4) and the RICO § 1962(c). Its structure includes decision-makers, such as attorneys, stakeholders, investors, sponsors, and organizational leaders, as well as participants who executed the unlawful acts. The enterprise's activities, including a pattern of stalking, surveillance, exploitation, predatory, coordinated cyberstalking, defamation, harassment, intentional exclusion, and misappropriation of Intellectual Property, were designed to harm the plaintiff's reputation, obstruct her nonprofit advocacy work, and profit from her original content. These activities directly affect interstate commerce as described below:

**Interstate or Foreign Trade and Commerce**

Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and 18 U.S.C. § 1962(c), which requires at least two predicate acts occurring within a ten-year period. The predicate acts here—stalking, surveillance, exploitation, coordinated cyberstalking, defamation, intentional exclusion, wire fraud, mail fraud, and obstruction of justice—were not isolated or accidental. They reflect a coordinated scheme with the shared purpose of discrediting Plaintiff, obstructing her advocacy work, and profiting from her Original Personal Story, academic research, and Intellectual Property. The acts were carried out by overlapping groups of defendants using similar means, including digital smear campaigns,

unauthorized use of Plaintiff's story and work, and coordinated legal and administrative actions to remove Plaintiff from her profession. The continuity of conduct is demonstrated by its duration, beginning on or about August 2018 and continuing through the present, with a clear threat of ongoing misconduct. Documentary evidence includes a cease-and-desist letter dated October 27, 2021, interview transcripts from October 2021, a February 25, 2022, letter sent to Hearst, and subsequent cease-and-desist notices issued November 17, 2024, December 5, 2024, March 5, 2025, and March 9, 2025, which reflect continued dissemination and misappropriation of Plaintiff's content.

**Pattern of Racketeering Activity**

The defendants engaged in a pattern of racketeering activity as defined under 18 U.S.C. § 1961(5), RICO § 1962(c), which requires at least two predicate acts of racketeering activity within a ten-year period. The predicate acts alleged in this case include, but are not limited to, stalking, surveillance, exploitation, coordinated pervasive cyberstalking, defamation, intentional exclusion, wire fraud, mail fraud, and obstruction of justice. These acts were not isolated incidents but part of a coordinated scheme with the intent to harm the plaintiff, Gina Medico, and to end her employment opportunities and destroy her nonprofit organization, Sweet Corner Girl Corp.

The predicate acts are related in that they share a common purpose: to discredit the plaintiff, obstruct her advocacy work, and profit from her Original Personal Story, academic research, and Intellectual Property. The acts were carried out by overlapping groups of defendants, some of which are still being uncovered, using similar methods, such as digital smear campaigns, unauthorized use of the Plaintiff's Personal Story, academic research, and content, and coordinated legal and administrative actions. The continuity of the predicate acts is demonstrated by their occurrence over a substantial period, beginning in or about August 2018

and continuing through to this date, with a threat of ongoing misconduct. Illustrative materials include a cease-and-desist communication dated October 27, 2021, interview transcripts from October 2021, and a letter to Hearst dated February 25, 2022, Cease and Desist letter to Christina Cocchiola, Polacko, Swithin and Dr. Ramani on November 17, 2024, December 5, 2024, March 5, 2025 and March 9, 2025 and evidencing continued dissemination and misappropriation of Plaintiff's content.

**Racketeering Activity**

The specific predicate acts of racketeering activity alleged in this case include:

a.      Stalking, surveillance, and exploitation, involving repeated and unwanted contact designed to instill extreme fear and extreme emotional distress in the plaintiff, in violation of 18 U.S.C. § 2261A.

b.      Defamation, through the dissemination of false, malicious and damaging statements about the plaintiff to third parties, including her employer and professional associates.

c.      Wire fraud, involving the use of electronic communications to stalk, surveil, exploit, and prey upon Plaintiff to misappropriate the Plaintiff's Personal Story, Intellectual Property and disseminate false narratives, including through the publication and republication of content derived from Plaintiff's interviews and advocacy materials for profit in or about October 21, 2021, and March 9, 2025 thereafter and continuing.

d.      Mail fraud, involving mail and email communications to misappropriate the plaintiff's Personal Story, Intellectual Property, and publishing and repeating a malicious false statement that Plaintiff falsified her employer's letterhead, including through the publication and republication of content derived from Plaintiff's academic research, interviews, and advocacy materials in or about October 21, 2021, thereafter and continuing.

e.      Obstruction of justice, through actions intended to interfere with the plaintiff's legal rights

and suppress evidence of the defendants' misconduct.

f.       Witness intimidation, aimed at coercing or silencing individuals who might provide

evidence in support of the plaintiff.

**Injury**

As a direct and proximate result of the defendants' racketeering activities, the plaintiff has

suffered significant injury to her business and property. These injuries include the loss of

nonprofit funding and sponsorships, reputational harm, and the misappropriation of her Original

Personal Story and academic Intellectual Property. The defendants' actions have also obstructed

the plaintiff's ability to conduct her nonprofit advocacy work, resulting in economic losses,

diminished professional, academic, and research opportunities.

**Statute of Limitations**

The plaintiff's claims are timely under the four-year statute of limitations for civil RICO

actions. The predicate acts alleged in this case occurred between August 2018 and continuing

through today's date, with the most recent discovery of acts falling on or about May 9, 2025,

which relates to the first discovered predicate act of October 21, 2021, and is within the

limitations period. Furthermore, the plaintiff asserts that the defendants' ongoing misconduct and

involvement in ending the Plaintiff's employment and advocacy business to conceal their actions

justify equitable tolling of the limitations period. The plaintiff acted with reasonable diligence in

uncovering the full extent of the defendants' scheme and filing this action promptly upon

discovery.

Pursuant to Fed. R. Civ. P. 15 (c), Plaintiff intends that each amendment substituting the

true name of any John Doe, Jane Doe, XYZ Stakeholder defendant will relate back to the

original filing date of this Complaint, because the conduct, transactions, and events giving rise to

this action are fully described herein, and because the Doe Defendants acted in concert with the named defendants as part of a common enterprise.

## II.    <u>JURISDICTION</u>

Defendants are subject to the personal jurisdiction of this court, as most Defendants reside and the conduct occurred or originated within the territorial jurisdiction of the District of Connecticut of Hartford County, Connecticut.

The identities of the Stakeholder Defendants are within the exclusive knowledge of the named defendants, and Plaintiff therefore invokes equitable tolling and any applicable discovery rule until the Doe Defendants' identities are disclosed.

The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## III.    <u>PARTIES</u>

1.     Plaintiff, Gina Medico ("Medico"), is currently residing in Connecticut and is the founder of Sweet Corner Girl Corp., a nonprofit that educates, counsels, aids and assists victims and survivors of domestic abuse/violence based on her academic research, academic writing, personal experiences, legal advocacy experiences, court experience, domestic abuse/violence, paralegal experience, and advocacy experience.

2.     Defendant, James S. Brownstein, Esquire ("Brownstein") is an attorney licensed in Connecticut and employed by Neubert, Pepe & Montieth, P.C. located in New Haven, CT and participated in Plaintiff's termination.

3.     Defendant, Neubert, Pepe & Montieth, P.C., is a law firm located in New Haven, CT, and is engaged in trade and commerce and participated in Plaintiff's termination.

4.     Defendant Angie DiDomenico ("DiDomenico") is an employee or agent of Neubert, Pepe & Montieth, P.C., and participated in Plaintiff's termination.

5.     Defendant, Emily Goodman, Esquire ("Goodman"), is an attorney affiliated with Akin Gump Strauss Hauer & Feld LLP with offices in New York, who represents government hedge funds and private equity firms involved in trade and commerce, and participated in Plaintiff's termination.

6.     Defendante, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), is a law firm with offices in New York that represents government hedge funds and private equity firms involved in trade and commerce and participated in Plaintiff's termination.

7.     Defendant, Anne Marcone ("Marcone"), is an employee of The Center for Family Justice, Inc. who claims to be an advocate of victims and survivors of domestic violence.

8.     Defendant, The Center for Family Justice, Inc. ("CFJ") is a non-profit organization in the state of Connecticut that claims to assist victims and survivors of domestic violence.

9.     Defendant, Suzanne Campos ("Campos"), claimed to be a victim of domestic violence and befriended Plaintiff to obtain her Intellectual Property, and is a member of Connecticut Protective Moms, Inc.

10.     Defendant, Betsy Keller ("Keller"), claims to be the founder of "grassroots" advocacy for victims of domestic violence and is engaged in lobbying legislators, advertising and marketing.

11.     Defendant, Connecticut Protective Moms, Inc., (a/k/a Protective Moms, Inc.) ("Protective Moms") organized by Keller, is a non-profit corporation engaged in advertising and marketing and lobbying legislators nationally, and advocating for domestic abuse/violence, and is involved in trade and commerce.

12.     Defendant, Connecticut Coalition Against Domestic Violence, Inc. ("CCADV") is a non-profit corporation and engages in advertising and marketing and is involved in trade and commerce.

13.     Defendant, Hearst Media Services Connecticut, LLC a/k/a Hearst Connecticut Media Group ("Hearst"), and subsidiaries, is a news media, involved in advertising and marketing, whose employees participated in predicate acts, including a pattern of stalking, surveilling, exploiting and preying upon the Plaintiff and to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presented original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content.

14.     Defendant, Clare Dignan, ("Dignan") was a reporter/writer for Hearst and various other news media groups and participated in predicate acts, including a pattern of stalking, surveilling, exploiting and preying upon the Plaintiff to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presenting original research and academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content, and participated in recreating and disseminating Plaintiff's original research work as her own.

15.     Defendant, Ramani Durvasula, PhD ("Dr. Ramani") is known as an author and internet psychologist personality *Dr. Ramani* and participated in predicate acts, including a pattern of stalking, coordinated pervasive cyberstalking the Plaintiff's Original Personal Story, academic research and Intellectual Property, publicly presented Original Personal Story, original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content, and participated in recreating and disseminating Plaintiff's original research work as her own.

16.     Defendant, Marc Fitch, ("Fitch") is a reporter/writer for the Connecticut Insider, LLC and other news media groups who participated in predicate acts, including a pattern of stalking, surveillance, and coordinated pervasive cyberstalking the Plaintiff to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presenting original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content, and participated in recreating and disseminating Plaintiff's Original Personal Story, original research work as his own.

17.     Defendant, Christine Cocchiola, LCSW, ("Cocchiola") claims various unverifiable credentials, advocacy positions, including "divorce coach" and participated in predicate acts, including a pattern of stalking, surveillance, pervasive coordinated cyberstalking, and preying upon the Plaintiff to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presented Personal Story, original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content. and participated in recreating and disseminating Plaintiff's Original Personal Story, original academic writing, and research as her own.

18.     Defendant, Narc Free Press, LLC ("Narc Free Press") is a limited liability company organized by Cocchiola and Amy Polacko in the State of Connecticut.

19.     Defendant, Amy Polacko, ("Polacko") claims to be a reporter/writer and holds various advocacy positions including "divorce coach" and participated in predicate acts, including a pattern of stalking and pervasive coordinated cyberstalking the Plaintiff to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presented original academic work, interviews, programmatic materials, and language for

survivor advocacy, all of which are protected expressions of speech and proprietary content and participated in recreating and disseminating Plaintiff's Original Personal Story, original academic writing and research work as her own.

20.     Defendant, Lisa Aronson Fontes, PhD. ("Fontes") claims various advocacy positions and participated in predicate acts, including a pattern of stalking the Plaintiff to obtain Plaintiff's Original Personal Story, academic research and Intellectual Property, publicly presented original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content and participated in recreating and disseminating Plaintiff's original research work as her own.

21.     Defendant, Tina Swithin, ("Swithin") of claims various advocacy positions and participated in predicate acts, including a pattern of stalking, surveillance, and pervasive coordinated cyberstalking the Plaintiff to obtain Plaintiff's Original Personal Story, Original Academic Research and Intellectual Property, publicly presented original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content and participated in recreating and disseminating Plaintiff's original research work as her.

22.     Defendant, One Mom's Battle, LLC ("OMB") and various pseudonyms – all of which have not been fully determined- is a California for-profit business and engages in lobbying legislators, advertising and marketing.

23.     Defendant, Kimberly Donohue, ("Donohue") was employed as the CEO of a private equity and a hedge fund company, and a member of Connecticut Protective Moms, Inc., and claimed to need the legal domestic violence advocacy assistance of Medico. Her role was to gain access to Plaintiff's home to take the MacBook portable device that contained the Plaintiff's Original Personal Story, original academic writing, and other personal items. Donohue

participated in predicate acts, including a pattern of stalking and pervasive coordinated cyberstalking the Plaintiff to obtain Plaintiff's Original Academic Research and Intellectual Property, publicly presented Original Personal Story, original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content, and participated in recreating and disseminating Plaintiff's original research work as her own.

24.     Unless otherwise stated, each Defendant is sued in their individual capacity for personal participation in the acts alleged, and, to the extent applicable, in their official capacity as an officer, agent, employee, or representative of a public or quasi-public entity, association-in-fact enterprise, or state-funded nonprofit to the extent the Defendant acted under color of law or exercised delegated authority through state-funded programs or victim-services grantmaking, in their official capacities involved in the actions described herein.

25.     The Defendants, jointly and severally, colluded with each other and acted in concert with a meeting of the mind to fabricate, construct and manufacture malicious lies about Plaintiff's character, with the intent to harm her, to have her terminated from her employment, while maliciously obstructing her nonprofit advocacy work for domestic abuse/violence and child abuse survivors in an effort to disseminate her Original Personal Story, Original Academic Research and Intellectual Property, publicly presented original academic, legal advocacy work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content to reframe her nonprofit messaging as their own.

26.     Each Defendant profited by repackaging Plaintiff's work into derivative exposés, articles, books, videos, interviews, workshops, instructional and training workshops for sale, distribution, public recognition, acclamation for themselves, each other, educational and

charitable grants, for their own profits, and the intent to end Plaintiff's professional occupation and advocacy non-profit.

27.     Plaintiff presently identifies additional as-yet-unidentified individuals who participated in the operation or management of the RICO enterprise described herein, including individuals who directed, coordinated, financed, authored, published, edited, or assisted in carrying out the predicate racketeering act alleged in this Complaint.

28.     The true names and capacities of Defendants John Does 1-10 and Jane Does 1-10 are presently unknown to Plaintiff. Plaintiff will seek leave of Court to amend this Complaint to identify these defendants by name upon information gained through discovery, third-party subpoenas, or other Court-authorized mechanisms.

29.     Each of the Doe Defendants is sued in their individual and personal capacity and severally liable for damages and equitable remedies available under 18 U.S.C. § 1964.

30.     Plaintiff presently identifies additional, as-yet-unidentified individuals and entities who acted as stakeholders of the enterprise, including individuals who funded, directed, approved, coordinated, sponsored, or materially benefited from the predicate act alleged in this Complaint. These individuals participated in the operation or management of the RICO enterprise or conspired with named defendants to violate 18 U.S.C. § 1962 (c) and (d).

31.     Upon obtaining the identities of these XYZ Stakeholder 1-10 Defendants through formal discovery, subpoenas, or court-ordered disclosure, Plaintiff will amend the Complaint to replace each Doe with the individual or entity's legal name that will show what they did, why Plaintiff does not have their names, where the names are located, and how they are included as associates-in-fact.

32.     Each XYZ Stakeholder 1-10 Defendant is sued in their individual capacity and capacity in their entity and is jointly and severally liable for damages and equitable relief under 18 U.S.C. § 1964(c).

33.     On information and belief, unnamed stakeholders, including directors, sponsors, donors, and advisors, participated in the enterprise by funding and directing the publication, distribution, and amplification of the defamatory statements concerning Plaintiff, including through editorial approvals, coordinated messaging, strategic distribution, and removal of dissenting viewpoints.  Such participants are presently identified in this Complaint as John Does 1-10, and Jane Does 1-10.

34.     Defendants, together with unidentified Stakeholder Defendants, coordinated the timing, platform, selection, solicitation, and narrative themes used to portray Plaintiff in a false and defamatory manner, with the purpose and effect of removing Plaintiff from professional markets and advocacy forums.  These unnamed Stakeholder Defendants are individuals whose identities are discoverable through internal emails, records, funding agreements, and communications within the enterprise.

35.     Defendants Keller, Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, John Doe 1-10, and Jane Doe 1-10 are individual participants in and/or collaborators with Protective Moms, CFJ, CCADV, and XYZ Stakeholders 1-10 are residents and/or engage in interstate trade and commerce in Connecticut.

36.     Defendants Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, are individual participants in and/or collaborators with Protective Moms, CFJ, CCDAV, and XYZ Stakeholders, John Does 1-10 and Jane Does 1-10 each participated in Plaintiff's termination.

## IV.    FACTUAL ALLEGATIONS (*COMMON TO ALL COUNTS*)

37.    On or about August 2018, Medico began participating in a support group of survivors of domestic abuse/violence at CFJ at 735 Fairfield Avenue, Bridgeport, Connecticut, Fairfield County, Connecticut, and was moderated by Marcone, an employee of CFJ

38.    Plaintiff, Medico, is a 2007 *honors* graduate of State College of Florida (formerly Manatee Community College, Bradenton, Florida) with an Associate of Science degree in paralegal. Medico is a 2019 *high honors* graduate of Bay Path University with a Bachelor of Science degree, focusing on domestic violence, victimization, and offender rehabilitation.

39.    Plaintiff, Medico, while a student enrolled in the criminal justice on-line accelerated program from on or about January 2017 through on or about December 2019 at Bay Path University, Longmeadow, Massachusetts, and was the owner/author/creator who submitted original copyright-protected researched academic essays focusing on domestic violence, victimization, and offender rehabilitation in pursuit of graduating with her bachelor's degree.

40.    Plaintiff, Medico, is the founder of Sweet Corner Girl Corp, a nonprofit dedicated to advocacy and education regarding domestic violence, with original academic writings, public speaking of her Original Personal Story, and academic research rooted in her personal experiences, legal experiences, court experiences, advocacy experience, and formal education.

41.    Plaintiff authored, published, and publicly presented her Original Personal Story, original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are copyright-protected expressions of speech and proprietary content.

42.    Defendant, Marcone, knew that Medico attended Bay Path University to obtain her bachelor's degree in criminal justice, which focused on domestic violence, victimization, and offender rehabilitation, and graduated with high honors in May 2019.

43.     Defendants are private organizations, non-profit organizations, and organizations serving the public interests through state or federal funding, including, but not limited to, educational and charitable grants.

44.     Defendants Keller, Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, John Doe 1-10 and Jane Doe 1-10 are individual participants in and/or collaborators with Protective Moms, CFJ, CCADV, and XYZ Stakeholders 1-10 are residents and/or engage in interstate trade and commerce in Connecticut.

45.     Defendants Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, are individual participants in and/or collaborators with Protective Moms, CFJ, CCADV, and XYZ Stakeholders. John Does 1-10, and Jane Does 1-10 each participated in Plaintiff's termination.

46.     On or about July 27, 2019, Medico provided, through email to Marcone with eighteen (18) Original Academic Research essays about domestic abuse/violence and victimization authored by Medico to publish in a domestic violence "newsletter," as described by Marcone.

47.     In or around March 2020, due to COVID-19, the support group of survivors moved to Zoom meetings hosted by Marcone.

48.     Members of Protective Moms, many of whom concealed their true identities, including Campos, first became involved in the Zoom meeting in March 2020, due to COVID-19, but were not known to be a part of the previous in-person group at The Center for Family Justice at 735 Fairfield Avenue, Bridgeport, Connecticut.

49.     On or about April 29, 2020, Campos befriended Medico in a Zoom meeting at CFJ, purporting herself to be a victim of domestic violence, and asking Medico for assistance with legal issues with her current dissolution and child custody case.

50.     On or about March 11, 2021, Medico created Sweet Corner Girl Corp. and developed content based on her Original Personal Story, personal experiences, legal experiences, court advocacy experiences, and Original Academic Research written and submitted to Bay Path University for her criminal justice degree.

51.     On or about June 6, 2021, Campos asked Medico to join her and "Connecticut Protective Moms" at the State Capitol in Hartford in promoting Jennifer's Law, as they needed "bodies."

52.     All parties knew Medico was a survivor of isolation, neglect, abuse, and violence as a child and domestic abuse/violence, judicial abuse, and mental health abuse as an adult.

53.     Plaintiff, Medico, due to her status as an adult survivor of child neglect/abuse and domestic abuse/violence, is particularly vulnerable and identified as a protected class.

54.     Plaintiff, Medico, qualifies as an individual with a disability under the Americans with Disabilities Act and the Connecticut Fair Employment Practices Act and is subject to Title II and/or Title III of the ADA, Section 504 of the Rehabilitation Act, and Connecticut public accommodation and anti-discrimination statutes.

55.     Defendants were, at all times relevant, acting under color of law and in their official and/or personal capacities.

56.     Plaintiff notified Defendants of active threats to her safety, including stalking and harassment.

57.     Defendants knew Plaintiff identified as a protected class status as a victim of domestic violence.

58.     Keller invited Medico to join their "victory" party, and before Medico left, Keller "disinvited" her.

59.    Marcone provided the original authored academic essays, and Campos provided the website designs and posts to Cocchiola, Fontes, Keller, Polacko, Dr. Ramani, Swithin, and other participants of Protective Moms, CFJ, and CCADV

60.    Campos engaged Medico in conversation to develop a workshop together to educate attorneys, law enforcement, and judges on domestic abuse.

61.    Campos stated that she was sharing the designs with her teenage daughter and provided Medico with draft copies of poster ideas in email that were obviously from the internet, when Medico declined as they were someone else's copyright protected material Susan Campos responded "Who cares" and asserted that she didn't care about the protection of original work as long as the message was out there while not disclosing to Medico that she was involved in advertising and marketing with Protective Moms and with Cocchiola, Polacko, Fontes, Keller, Dr. Ramani, Swithin, CFJ, and CCADV.

62.    On or about May 1, 2021, and at times thereafter, Medico shared several original drafts of her website design and content pages to Campos which was later used starting with the October 21, 2021 workshop presented by Protective Moms, Cocchiola, Polacko, Fontes, Keller, Swithin as their own research and production and continues to be used by Protective Moms, Cocchiola, Fontes, Keller, Dr. Ramani, Swithin, CFJ, CCADV, XYZ Stakeholders, John Does 1-10 and Jane Does 1-10, their associates and affiliates.

63.    From April. 29, 2020, through October 21, 2021, Medico shared by email with Campos other Original Copyright-Protected Writing About Her Experiences of Domestic Abuse/Violence, Court Experiences, Legal Experiences, and Child Abuse/Neglect.

64.    Campos provided Medico's original authored content and designs to Cocchiola, Polacko, Fontes, Keller, Dr. Ramani, Swithin, and other speakers for a paid presentation at the October 21, 2021, workshop.

65.     On October 21, 2021, Keller, Cocchiola, Fontes, and other speakers presented Medico's academic research, website, and a slide titled *Press Release* and other original copyright-protected material authored by Medico without giving proper credit to its author, Medico.

66.     Defendants Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, are individual participants in and/or collaborators with Protective Moms, CFJ, CCADV, XYZ Stakeholders, and John Doe 1-10 and Jane Doe 1-10 each participated in Plaintiff's termination.

67.     Defendants Keller, Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, and Fontes, are individual participants in and/or collaborators with Protective Moms, CFJ, CCADV, John Does 1-10, Jane Does, 1-10, and XYZ Stakeholders 1-10 are residents and/or engage in interstate trade and commerce in Connecticut.

68.     Defendants Keller, Marcone, Campos, Cocchiola, Polacko, Swithin, Dr. Ramani, Donohue, Dignan, Fitch and Fontes, John Doe 1-10 and Jane Doe 1-10 are individual participants in and/or collaborators with and/or engage in advertising and marketing for Protective Moms, CFJ, CCADV and XYZ Stakeholders 1-10.

69.     On October 21, 2021, Campos invited Medico to her home to view the workshop presented by Keller, Cocchiola, Fontes, "Protective Moms," and other speakers.

70.     While there, Medico questioned Campos no less than six (6) times to see if she also knew that Medico's Intellectual Property, research, academic, and advocacy work was directly used in the October 21, 2021, workshop without giving credit to Medico.

71.     Campos responded with deflection, distraction, evasion, and ignorance while hiding her smirking smile, which seemed to indicate she was delighted in Medico's shock and extreme distress at hearing her research being used by others without consent or credit.

72.     On October 22, 2021, Medico told Campos that she would no longer be assisting her with her current dissolution action and stated that Plaintiff believed Campos shared her work with members of Protective Moms.

73.     On October 22, 2021, Campos provided an email from Fontes with "evidence" of Fontes's research to compensate for using Plaintiff's Creative Expressions where Plaintiff Specifically Discussed "Domestic Abuse," Academic Writing, Legal Advocacy With "30 Years of Research," Plaintiff's Dialogue on her *Press Release*, and Website Page of Sweet Corner Girl Corp., none of which supported their use of Medico's work.

74.     Campos responded with a text message stating "I do get it…they are echoing what I [sic] have done.  But I [sic]the flip side know your work is so great" and that " I just don't want it to eat away at you" [The theft and use of my Intellectual Property without consent].

75.     On October 22, 2021, Plaintiff, Medico, disclosed to her immediate employment supervisor, James Brownstein, that she was experiencing stalking, cyberstalking, theft of academic essays and Intellectual Property without consent, intentional exclusion and harassment by members of CT Protective Moms, Inc. and specifically, Campos, Keller, Marcone, Cocchiola, Polacko, Swithin, Fontes, and other members.

76.     Defendant, Neubert Pepe & Montieth, P.C. ("NPM") employed Plaintiff, Medico, as a certified paralegal until termination on November 4, 2021.

77.     On or about October 26, 2021, Defendant Brownstein, acting in his official capacity as an attorney at NPM, authored, handwrote edits, and formally signed a cease-and-desist letter on Neubert, Pepe & Montieth law firm letterhead notifying Keller and Protective Moms, on behalf of Plaintiff Medico and her nonprofit, Sweet Corner Girl Corp.

78.     On or about October 27, 2021, Mr. Brownstein directed the letter to be sent via FedEx by firm staff member, Jackie Morris, with tracking receipts confirming its dispatch and receipt by Keller and Protective Moms

79.     Copies of the October 27, 2021, correspondence to "Immediately Cease & Desist" authored by James Brownstein, Esq. were also provided to Campos, Cocchiola, Fontes, and other participants.

80.     On or about November 3, 2021, Defendant, Goodman acting in her official capacity as an attorney at Akin Gump contacted Defendant, Brownstein, and coordinated a manufactured, malicious false statement with the intent to permanently harm the professional and public reputation of Medico by stating that she used James Brownstein and Neubert Pepe & Monteith's letterhead without his permission and conspired to have her terminated from her employment, knowing this statement to be false, slanderous, and manufactured by Goodman, Campos, Marcone, Cocchiola, Polacko, Fontes, Swithin and Protective Moms, CFJ, CCADV.

81.     On or about November 3, 2021, Defendant, Brownstein, provided a small sticky note with the written name of Emily Goodman, Esq. representing Connecticut Protective Moms, Inc. and a New York telephone number, stating to Plaintiff that Emily Goodman had contacted him, confirming receipt of the Cease and Desist authored by him on behalf of Medico.

82.     Plaintiff was terminated by NPM (letter dated November 4, 2021), citing alleged "failure to approve correspondence before sending," and deficiencies in performance, none of which had been previously documented in a progressive disciplinary manner.

83.     The proffered reason for termination is pretextual and retaliatory. The actual reason involved false accusations that Plaintiff had misused Brownstein's letterhead without authorization—an assertion Brownstein knew to be malicious and untrue since he authored,

edited, signed, and directed the transmission of the letter himself to an employee of NPM other than Medico.

84.    Defendants, Angie DiDomenico and Neubert, Pepe & Monteith, P.C. knew the truth. Still, they colluded to go along with and manufactured a malicious false narrative to terminate Plaintiff and protect the fraudulent actions of members of Campos, Cocchiola, Marcone, Polacko, Goodman, Fontes, Swithin, Protective Moms, CFJ, and the CCADV.

85.    Simultaneously, members of Protective Moms, CCADV, including Keller, Campos, Marcone, Cocchiola, Polacko, Donohue, Goodman, Fontes, and Swithin, and others, began replicating and presenting Plaintiff's Original Personal Story, Intellectual Property, namely her domestic abuse/violence and "coercive control" research and advocacy framework, as their own and crediting themselves and each other.

86.    These actions were accompanied by harassment, surveillance, cyberstalking, and stalking of Plaintiff by Campos, Marcone, Cocchiola, Polacko, Donohue, Emily Goodman, Fontes, and Swithin, and other hired and covert actors, including at advocacy events.

87.    Despite being aware of the danger Plaintiff faced after disclosing to Brownstein that Medico was being stalked, surveilled, exploited and preyed upon by members of Connecticut Protective Moms, Inc., Plaintiff's employers, James Brownstein, Angie DiDomenico and, Neubert, Pepe and Monteith, P.C. not only failed to protect Plaintiff but took deliberate steps to marginalize and retaliate against her, in what appears to be a coordinated campaign to erase her from the advocacy community and knowingly failed to intervene and took part in the coordinated exclusion.

88.    Despite being aware of the danger Plaintiff faced after receipt of the Cease & Desist authored by James Brownstein, Esq. that Medico was being stalked, surveilled, exploited and preyed upon by members of Protective Moms and CCADV, deliberate steps to marginalize

22

and retaliate against Medico were taken by Emily Goodman and Akin Gump and not only failed to protect Plaintiff, but took, in what appears to be a coordinated campaign to erase her from the advocacy community and knowingly failed to intervene and took part in the coordinated exclusion.

89.     Defendants Goodman and Akin Gump, believed to be collaborating with or financially supporting actors or "unnamed stakeholders" associated with the misappropriation and suppression of Plaintiff's exploitation, content, and professional reputation.

90.     On February 25, 2022, Medico authored a letter to Hearst notifying them of Dignan's use of Medico's Intellectual Property.

91.     Defendants Dignan and Hearst copied verbatim and/or paraphrased Plaintiff's copyrighted and original language, concepts, and advocacy strategies without attribution to Medico.

92.     Dignan's article titled *"7 Takeaways from Our Yearlong Investigation into Intimate Partner Violence"* systematically incorporates Plaintiff's protected material, including her language on systemic failures, victim psychology, legislative delay, and unmet safety planning needs.

93.     Dignan's article also advertised the article to "fill the gap," which was directly from Medico's webpage and videos as part of her mission as an advocate for victims/survivors of domestic abuse.

94.     Dignan used the content created in a video interview of Medico that was produced by Alana Vera of *"Ascending with Alana"* and publicly aired on Instagram on October 16, 2021, and Dignan credited herself as performing research that was the research and work of Medico.

95.     Dignan used the content created in video interviews of Medico that was produced by Tina Durbin of *"Reel Change - Love Over Coffee"* and publicly aired on October 3, 2021, and

October 31, 2021, and credited herself as performing research that was the research and work of Medico.

96.     Dignan further used Medico's research for her article, advertising "an urgent gap" created by Medico and published on the website of "Sweet Corner Girl Corp" and provided to Campos through email, named *Press Release* to her in contemplation of "working together" to create a workshop.

97.     Defendant Hearst published this article for commercial and reputational gain, thereby depriving the Plaintiff of credit and benefiting from her intellectual research and labor.

98.     On or about February 2022, in response to the article titled *"7 Takeaways from Our Yearlong Investigation into Intimate Partner Violence,"* Connecticut Governor Ned Lamont publicly praised Dignan and the investigators of Hearst and announced that he would allocate $18 million to domestic violence to the CCADV that was publicly accepted to "fill the gap" in victim services based on Medico's original published research and copyright protected material.

99.     Defendants, Campos, Cocchiola, Marcone, Polacko, Donohue, Goodman, Fontes, Swithin, Protective Moms, CFJ, and the CCADV provided Dignan and Hearst with Medico's the original academic writings, public speaking of her Original Personal Story, and academic research rooted in her personal experiences, legal experiences, court experiences, advocacy experience, and formal education without attribution of the original copyrighted research to Medico, the original author/creator/owner of the copyright protected material and otherwise maintained fabricated allegations of unauthorized use of letterhead despite James Brownstein, Esq. having authored, edited, signed, and directed its distribution to an employee other than Plaintiff.

100.    When the previous cease and desist letters brought attention to the theft of Intellectual Property, Protective Moms and CCADV, including Keller, Campos, Marcone,

Cocchiola, Fontes, Polacko, Donohue, Dr. Ramani, and Swithin, and engaged others to stalk, surveil, exploit, defraud, defame, coordinated pervasive cyberstalking, harassment, intentionally exclude, prey upon and discredit the Plaintiff professionally in her reputation.

101.    On March 1, 2022, Defendant Donohue gained access to Medico and her personal effects when Plaintiff resided at 23 Park Place, Middletown, Connecticut 06457, when Donohue claimed to be a friend and immediately needed a place to stay in an emergency.

102.    On March 3, 2022, Donohue fabricated a story that she had to attend a court hearing in Bridgeport Superior Court but needed appropriate clothing to attend.

103.    Medico provided appropriate clothing for Donohue to present herself at her court hearing.

104.    On March 4, 2022, Plaintiff, Medico, was away from her home at work when Defendant, Donohue, stole the plaintiff's MacBook Air computer containing her academic research, essays, private communications, and Intellectual Property, along with approximately $500.00 of the Plaintiff's clothing, and left the residence with no plans to return.

105.    There was no scheduled court hearing for Donohue on March 4, 2022.

106.    Donohue directed the downstairs neighbors, Chelsie Reed, Ryan Reed, and others, to engage in and maintain a pattern of stalking, surveillance, electronic harassment, noise harassment, unexplained electrical and other occurrences with the intent to harm Plaintiff that continued until Medico moved out of the premises at 23 Park Place, Middletown, Connecticut 06457 on September 30, 2022.

107.    Immediately after leaving Plaintiff's home on March 4, 2022, Donohue engaged in a series of text messages, telephone calls, and cryptic messages to Medico with the intent to harm her by creating fear and concern for her safety, knowing that Plaintiff had experienced domestic abuse and violence. Donohue stated that she had contact with Protective Moms, but

would not disclose her location, although she stated she was "in danger" and in "fear" without continuing conversations.

108. Immediately after leaving Plaintiff's home on March 4, 2022, the downstairs neighbors, Chelsie Reed, Ryan Reed, and others, to engage in and maintain a pattern of stalking, surveillance, noise harassment, and unexplained occurrences with the intent to harm Plaintiff that continued until Medico permanently moved out of the premises at 23 Park Place, Middletown, Connecticut 06457 on September 30, 2022.

109. Donohue continued with a pattern of harassing text messages for nine (9) days until March 13, 2022, when Plaintiff told her to stop contacting her and blocked her contact number.

110. Incidents of theft, unlawful entry, stalking and harassment against Medico in the apartment from March 1, 2022 through September 30, 2022 were reported and attempted to be reported to landlord, Law Enforcement, Fire Department, medical personnel, property manager (realtor), and others in the community, where Medico requested investigation and written reports to memorialize the stalking and harassment but was denied, or discouraged from documentation with suggestions to seek evaluation of her mental stability or threat of arrest.

111. Events and incidents were so frightening and unexplainable that Medico fled the apartment, sought medical attention, and stayed at a friend's home, at a hotel, or local rest area to escape the pattern of stalking, surveillance, exploitation, defamation, harassment, intentional exclusion, banging, harassment, unexplained occurrences, and persistent electronic and noise harassment.

112. On September 30, 2022, all electronic and noise harassment ceased when Plaintiff moved from the premises at 23R Park Place, Middletown, CT 06457.

113.    On December 6, 2022, Fontes, wrote an article for DomesticShelters.org titled *Who Are All the People involved In My Child Custody Case?* which was an almost verbatim match and synonymic and conceptual similarities in every point of Medico's copyright-protected audio recording on Clubhouse platform of January 14, 2022 titled *Abuse – You Tell No One – You Tell Everyone* which was an Original Personal Story and expression of experiences of Medico.

114.    On May 28, 2023, Marc Fitch, wrote an article that included interviews of members of Protective Moms, some of whom are named, herein, titled *High Conflict: Is Connecticut's family court system ignoring abuse?* that is based on adaptation, recreation, or a derivative of the academic research, creative expressions, and the Original Personal Story of Medico without her consent or assigning credit.

115.    Fontes recently announced that she is authoring a book that is based on an adaptation, recreation, or derivative of the academic research, creative expressions, and the Original Personal Story of Medico without her consent or assigning credit.

116.    On October 1, 2024, Cocchiola and Polacko released a book *Framed: Women in the Family Court Underworld* with the Forward written by Ramani Durvasula, PhD and the Epilogue written by Marcone and which was an adaptation, recreation, derivative of the academic researched essays, creative expressions and Original Personal Story of Medico and further previously authored and aired beginning June 1, 2021 on Clubhouse platform under Medico's Clubhouse name "Sweet Corner Girl" and other moderated chatrooms of Clubhouse in addition to Instagram, Facebook, YouTube, TikTok, Streamyard, and other platforms owned/authored/created by Medico and interviewed and aired by Tina Durbin of *Reel Change – Love Over Coffee*.

117.    On November 17, 2024, Medico sent a notice of copyright infringement and a Notice to Cease-and-Desist to Cocchiola and Polacko regarding the released book titled *Framed: Women in the Family Court Underworld.*

118.    On November 22, 2024, Emily Goodman, Attorney at Law forwarded correspondence to Medico threatening to take legal action should Medico not retract her Cease-and-Desist letter dated November 17, 2024.

119.    On November 29, 2024, Medico sent a *verified* Second Notice of Copyright Infringement and a Notice to Cease-and-Desist to Cocchiola, Polacko and Goodman, Dr. Ramani, and Swithin.

120.    On July 24, 2024, Cocchiola and Polacko engaged Sharon Reed of *The Co-Parent TrapEp1* to create a video by specifically copying, adapted, recreated, re-enacted the video/audio podcast aired on Clubhouse under Medico's House Name "Sweet Corner Girl" and other Clubhouse rooms maintained by other moderators in addition to YouTube, Facebook, Instagram, Threads, TikTok, and other platforms owned/authored/created by Tina Durbin of Reel Change beginning June 1, 2021 through this date.

121.    On August 21, 2024, Cocchiola and Polacko engaged Sybil of *"Rising Beyond Podcast"* created a podcast *How Women are Framed in the Family Court Room* to recreate a video by specifically copying, adapted, recreated, re-enacted the video/audio podcast owned/authored/created by audio Clubhouse platform under Medico's House Name "Sweet Corner Girl" and other audio Clubhouse rooms maintained by other moderators in addition to academic essays provided to Marcone to be published in a purported "newsletter," and other writing provided to Campos, along with videos aired on YouTube, (Meta) Facebook, Instagram, Threads, TikTok, and other platforms owned/authored/created by Tina Durbin of Reel Change beginning June 1, 2021 through this date and additionally, taken from the statements created into

three separate videos on October 1, 2023, October 2, 2023 and January 30, 2024. Additionally, academic research essays and court advocacy letters taken from the blog posts starting March 25, 2024, through November 29, 2024, the website of Sweet Corner Girl, maintained by Medico, who originally owned/authored the research.

122.    On February 10, 2025, and August 26, 2024, Cocchiola engaged Sarah Edmondson and Anthony Ames of "*A Little Bit Culty*" to create a podcast interview named "*Framed: Dr. C on Coercive Control and Family Court Trama and Post Narc Therapy: Robin Stern, Dr. Ramani & Dr. Cocchiola*" and recreated an audio recording that specifically copied, adapted, recreated, of the academic writing and Personal Story of Medico and re-enacted the video/audio podcast owned/authored/created by and Medico of Sweet Corner Girl Corp and Tina Durbin of Reel Change – Love Over Coffee aired June 1, 2024 on Clubhouse, and may have further displayed on YouTube, TikTok and other platforms and additionally, taken from the Original Personal Story and statements created into three separate videos on October 1, 2023, October 2, 2023 and January 30, 2024. Content was also taken from the Instagram posts and Facebook posts beginning March 2021 and blog posts starting March 25, 2024, through the present date of the website of Sweet Corner Girl Corp., created by Medico, of the originally owned/authored research.

123.    On May 2, 2025, Cocchiola created a Tedx video to recreate an audio recording specifically copied, adapted, recreated, and re-enacted the Original Personal Story and academic writing of Medico and the video/audio podcast owned/authored/created by *Tina Durbin of Reel Change – Love Over Coffee* and Medico of Sweet Corner Girl Corp aired October 31, 2023, on and may have further displayed on YouTube, TikTok and other platforms and additionally, taken from the statements created into three separate videos on October 1, 2023, October 2, 2023 and

January 30, 2024. Additionally, taken from the blog posts starting March 25, 2024, through the present date of the website of Sweet Corner Girl Corp., the originally owned/authored research.

124.   On May 5, 2025, Medico sent a Notice of Copyright Infringement and a Notice to Cease and Desist to Cocchiola, Polacko, Emily Goodman, and Swithin, with notification to Dr. Ramani and notice to participants who were benefitting financially from the copyright-protected material unlawfully obtained and distributed by Cocchiola, Polacko, Swithin, Dr. Ramani and participants who purchased Plaintiff's copyright-protected material.

125.   Defendant Goodman, acting under the color of legal authority, is believed to have contributed to the strategic misuse of professional influence to target Plaintiff, discredit her nonprofit, and facilitate the spread of defamatory and retaliatory narratives.

126.   On November 22, 2024, Goodman, acting under the color of legal authority, contacted the Plaintiff by email from the email address emgoodman@gmail.com, threatening legal action against Plaintiff if Plaintiff did not retract the Notice of Copyright Infringement and Cease and Desist dated November 17, 2024 within five (5) days.

127.   These actions were not taken for any legitimate purpose but rather to suppress Plaintiff's rights, punish her for asserting ownership over her protected work, and obstruct her legal and professional relationships.

128.   Despite actual notice, Defendants failed to take reasonable steps to protect Plaintiff, including failure to investigate, implement safety protocols, or otherwise intervene.

129.   Plaintiff has sustained reputational harm, emotional distress, lost employment opportunities, lost academic opportunities, and economic damages as a direct result of the improper and malicious actions by the Defendants.

130.   Plaintiff suffered emotional distress, physical and mental anguish, and loss of access to services and safe accommodations due to Defendants' malicious actions.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT I – VIOLATION OF 18 U.S.C. § 1962(c) (RICO – Conducting an Enterprise Through a Pattern of Racketeering Activity)

131.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

132.    The enterprise alleged in this action is a decentralized network of individuals and entities, including attorneys, media organizations, nonprofit advocacy groups, and other collaborators, who coordinated their actions to further a common unlawful purpose. The enterprise is not a single legal entity, but an association-in-fact enterprise as defined under 18 U.S.C. § 1961(4). Its structure includes decision-makers, such as attorneys and organizational leaders, as well as participants who executed the unlawful acts.

133.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff, Medico. Specifically, the Defendants engaged in a coordinated campaign of stalking, surveillance, exploitation, fraud, harassment, intentional exclusion, defamation, obstruction of justice, witness intimidation, mail and wire fraud, all of which were

designed to harm the Plaintiff's reputation, obstruct her nonprofit advocacy work, and profit from her Original Personal Story and Intellectual Property.

134. Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of racketeering activity, including but not limited to:

    a. Stalking, surveillance, and exploitation, which included repeated and unwanted contact designed to instill fear and emotional distress in the Plaintiff, in violation of 18 U.S.C. § 2261A and applicable state laws;

    b. Defamation, through the creation and dissemination of false, malicious, and damaging statements about the Plaintiff to third parties, including her employer and professional associates;

    c. Wire fraud, involving the use of electronic communications to misappropriate the Plaintiff's Intellectual Property and disseminate false claims of authorship;

    d. Mail fraud, involving the use of mail, email, through the dissemination of false, malicious, and damaging statements of misuse of law firm letterhead to third parties, including her employer and professional associates;

    e. Obstruction of justice, through actions intended to interfere with the Plaintiff's legal rights and suppress evidence of the Defendants' misconduct; and

    f. Witness intimidation, aimed at coercing or silencing individuals who might provide evidence in support of the Plaintiff.

135. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). These acts were related in that they shared a common purpose: to surveil, exploit, defraud, defame, prey upon, and discredit the Plaintiff, obstruct her advocacy work, intentionally exclude her from advocacy, and profit from her Original Personal Story and Intellectual Property. The acts were carried out by overlapping groups of Defendants using similar methods, such as digital smear campaigns, unauthorized use of the Plaintiff's Original Personal Story, intellectual content, and coordinated legal and administrative actions. The continuity of the predicate acts is demonstrated by their occurrence over a substantial period, beginning in or about August 2018 and continuing through today's date, with a threat of ongoing misconduct.

136. As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff Medico has been injured in her business and property.

These injuries include the loss of nonprofit funding and sponsorships, reputational harm, and the misappropriation of her Intellectual Property. The Defendants' actions have also obstructed the Plaintiff's ability to conduct her nonprofit advocacy work, resulting in economic losses and diminished professional opportunities.

The plaintiff has suffered damages, including:

    a. Loss of profit from copyrighted Intellectual Property;
    b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
    c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
    d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
    e. Loss of profit from speaking engagements and presentation opportunities
    f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
    g. Loss of paralegal reputation;
    h. Loss of nonprofit funding and sponsorship;
    i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT II – VIOLATION OF 18 U.S.C. § 1962(a)(RICO – Use or Investment of Income Derived From a Pattern of Racketeering Activity)

137.    All preceding allegations are hereby incorporated and realleged in this Count as if fully set forth herein.

138.    The enterprise alleged in this action is a decentralized network of individuals and entities, including attorneys, media organizations, nonprofit advocacy groups, and other collaborators, who coordinated their actions to further a common unlawful purpose. The enterprise is not a single legal entity, but an association-in-fact enterprise as defined under 18 U.S.C. § 1961(4). Its structure includes decision-makers, such as attorneys and organizational leaders, and participants who executed the unlawful acts.

139.    The Defendants used and invested income derived from a pattern of racketeering activity in an interstate enterprise. Specifically, the Defendants profited from the

misappropriation of Plaintiff Medico's Intellectual Property, including her Original Personal

Story, Original Academic Research, nonprofit advocacy materials, and used those proceeds and

benefits to further the enterprise by disseminating a malicious false statement and suppressing

Plaintiff's advocacy work across state lines. [Further particulars regarding the use or investment

of racketeering income will be supported by evidence when Unnamed (Unidentified)

"Stakeholders" and Unnamed (Unidentified) Sponsors are further identified and, if necessary, by

amendment consistent with the record.]

     140.    As a direct and proximate result of Defendants' racketeering activities and

violations of 18 U.S.C. § 1962(a), Plaintiff Medico has been injured in her business and property.

These injuries include the loss of nonprofit funding and sponsorships, reputational harm, and the

misappropriation of her Intellectual Property for their own advancement and profit. The

Defendants' actions have also obstructed the Plaintiff's ability to conduct her nonprofit advocacy

work, resulting in economic losses and diminished professional opportunities.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

**COUNT III – VIOLATION OF 18 U.S.C. § 1962(b) (RICO – Acquisition or Maintenance of an Interest in an Enterprise Through a Pattern of Racketeering Activity)**

141.    All preceding allegations are hereby incorporated and realleged in this Count as if fully set forth herein.

142.    The enterprise alleged in this action is a decentralized network of individuals and entities, including attorneys, media organizations, nonprofit advocacy groups, and other collaborators, who coordinated their actions to further a common unlawful purpose. The enterprise is not a single legal entity, but an association-in-fact enterprise as defined under 18 U.S.C. § 1961(4).  Its structure includes decision-makers, such as attorneys and organizational leaders, as well as participants who executed the unlawful acts.

143.    The Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically, the Defendants engaged in acts of stalking, surveillance, exploitation, defamation, harassment, obstruction of justice, witness intimidation, and wire fraud, among other predicate acts, to suppress Plaintiff Medico's nonprofit advocacy work, misappropriate her Intellectual Property, and profit from her original content. These actions allowed the Defendants to control the narrative surrounding Plaintiff's advocacy work and to dominate the market for nonprofit advocacy and related intellectual content.

144.    The Defendants coordinated actions included the replication and dissemination of Plaintiff's Original Academic Research, nonprofit advocacy materials, and Personal Narrative without attribution. By misappropriating these materials, the Defendants diverted economic opportunities, sponsorships, and professional recognition away from the Plaintiff and toward the enterprise. The Defendants also engaged in a campaign of reputational harm and professional isolation, which further solidified their control over the enterprise and its operations.

145.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff Medico has been injured in her business and property.

These injuries include the loss of nonprofit funding and sponsorships, reputational harm, and the misappropriation of her Intellectual Property.

146.    The Defendants' actions have also obstructed the Plaintiff's ability to conduct her nonprofit advocacy work, resulting in economic losses and diminished professional opportunities.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT IV – VIOLATION OF 18 U.S.C. § 1962(d) (RICO – Conspiracy to Violate §§ 1962(a), 1962(b), and 1962(c))

147.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

148.    As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c). Specifically, the Defendants conspired to: (1) use or invest income derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in and control of the enterprise through a pattern of racketeering activity (§ 1962(b)); and (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)).

149.    Defendants intentionally conspired and agreed to directly and indirectly use or invest income derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

150.    The Defendants' conspiracy involved coordinated actions, including, but not limited to, engaging in stalking, surveilling, coordinated pervasive cyberstalking, defamation, harassment, obstruction of justice, witness intimidation, and wire fraud; misappropriating Plaintiff Medico's Intellectual Property and nonprofit advocacy materials; disseminating false narratives to harm her reputation; and obstructing her ability to conduct her nonprofit advocacy work. These actions were carried out with the shared coordinated effort to covertly assume the Intellectual Property owned/authored/created by Medico and profit from Plaintiff's work, isolating her from professional networks, and suppressing her advocacy efforts.

151.    Plaintiff alleges that the Stakeholder Defendants knowingly agreed to facilitate a scheme that, if completed, would satisfy all element of a RICO offense, including by providing funding, direction, sponsorship, institutional approval, audience access, and material support to the predicate acts alleged herein.  Each Stakeholder Defendant is therefore liable under 18 U.S.C. § 1962 (d).

152.    As a direct and proximate result of the Defendants' conspiracy, the overt and covert acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff Medico has been injured in her business and property. These injuries include the loss of nonprofit funding and sponsorships, reputational harm, misappropriation of her Intellectual

Property, and the obstruction of her ability to conduct her nonprofit advocacy work, resulting in economic losses and diminished professional opportunities.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunitie:
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT V: COPYRIGHT INFRINGEMENT AND MISAPPROPRIATION OF INTELLECTUAL PROPERTY AND UNJUST ENRICHMENT

153.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

154.    Plaintiff, Medico, is the founder of Sweet Corner Girl Corp, a nonprofit dedicated to advocacy and education regarding domestic violence, with original academic writings, public speaking, and academic research rooted in her Original Personal Story, personal experiences, legal experiences, court experiences, advocacy experience, and formal education.

155.    Plaintiff authored, published, and publicly presented original academic work, interviews, programmatic materials, and language for survivor advocacy, all of which are protected expressions of speech and proprietary content.

156.    Defendants, Campos, Cocchiola, Marcone, Polacko, Fontes, Swithin, Protective Moms, CFJ, and the CCADV provided Dignan, Hearst, Fitch with Medico's the original academic writings, public speaking of her Original Personal Story, and academic research rooted

in her personal experiences, legal experiences, court experiences, advocacy experience, and

formal education without attribution of the original copyrighted research to Medico, the original

author/creator/owner of the copyright protected material and otherwise maintained fabricated

allegations of unauthorized use of letterhead despite James Brownstein, Esq. having authored,

edited, signed, and directed its distribution to an employee other than Plaintiff.

      157.    Defendants engaged in a coordinated campaign of digital, professional, and

reputational pattern of stalking, surveilling, and preying upon Plaintiff after learning of her

academic work in advocacy and domestic abuse/violence reform.

      158.    Such unauthorized use constitutes willful copyright infringement,

misappropriation of proprietary and trade secret information, and unjust enrichment.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT VI: STALKING AND HARASSMENT (18 U.S.C. § 2261A; CONN. GEN. STAT. §§ 53a-181d, 53a-183)

      159.    All preceding allegations are hereby realleged and incorporated in this Count as if

fully set forth herein.

160.    All parties knew Medico was a survivor of stalking, isolation, neglect, abuse, and due to her status as a survivor of child neglect/abuse and domestic abuse/violence, she is particularly vulnerable and identified as a protected class.

161.    Defendants knew of Plaintiff's protected class status.

162.    Defendants engaged in a coordinated campaign of digital, professional, and reputational pattern of stalking, surveilling, and preying upon Plaintiff after learning of her academic work in advocacy and domestic abuse/violence reform.

163.    Campos, Marcone and Donohue befriended Plaintiff under false pretenses, solicited proprietary research, participated in collaborative legislative efforts, and then relayed Plaintiff's copyright-protected intellectual content to Hearst, Dignan, Cocchiola, Fontes, Polacko, Dr. Ramani, Keller, Protective Moms, Goodman, Akin Gump, Brownstein, NPM, CCADV CFJ, Fitch, Swithin, OMB, John Does, Jane Does, XYZ Stakeholders, their affiliates and associates for sale and profit.

164.    Campos, Marcone, Keller, Donohue, Cocchiola, Amy Palacko, Fontes, Swithin, and members of Protective Moms, CFJ and CCADV misrepresented themselves as collaborators or survivors of Domestic Violence to gain access to the Plaintiff's original content for their use in their advertising, marketing and lobbying campaign.

165.    Following Plaintiff's refusal to affiliate or condone the misappropriation, Defendants retaliated by isolating her from advocacy networks, colluding to manufacture and initiate defamatory communications with Plaintiff's employer, and collaborating and contributing to her termination.

166.    Campos, Marcone, Keller, Cocchiola, Polacko, Donohue, Goodman, Fontes, Swithin, Protective Moms, CFJ and the CCADV provided Dignan and Hearst, Fitch, Connecticut Insider and others with Medico's original academic writings, public speaking of her Original

Personal Story, and academic research rooted in her personal experiences, legal experiences, court experiences, advocacy experience, and formal education without attribution of the research to Medico, the original author/creator/owner of the copyright protected material and otherwise maintained fabricated allegations throughout the community of unauthorized use of letterhead despite James Brownstein, Esq. having authored, edited, signed, and directed its distribution to an employee other than Plaintiff.

167.    Defendants intentionally created instability by manufacturing a malicious statement to have her terminated from her employment, to have her focus on obtaining new employment, and not on the fact that they were taking over Plaintiff's compilation of research, legal advocacy, and creative academic writing.

168.    These actions meet the statutory definition of a pattern of stalking, surveillance, and harassment under Connecticut and federal law as they involved repeated contact, threats to harm her reputation, and the use of third parties to instill emotional distress and financial loss.

169.    Defendants engaged in deliberate stalking, false publications and circulation of materials to exclude Plaintiff from Domestic Violence advocacy spaces.

170.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

171.    Defendants' repeated public targeting and digital smear campaigns constituted a coordinated campaign of reputational assault, causing economic loss and re-triggering of Post-Traumatic Stress Disorder symptoms.

172.    Defendants continued to stalk Plaintiff on social media platforms to witness the effects of the harm that the slander, defamation, theft, and use of Plaintiff's work while claiming and crediting as their own researched work.

Case 3:25-cv-02045-SVN     Document 1     Filed 12/11/25     Page 42 of 69

173.    Their collaborative targeting demonstrates a "pattern of racketeering activity" under 18 U.S.C. Sec. 1961, involving mail/wire fraud, witness intimidation, and coercive control.

174.    Recreated and republished false narratives about Plaintiff's work and identity despite knowledge of her trauma.

175.    Their writings and public speech provided cover for other actors' coordinated patterns of abuse by isolating her from key institutional platforms.

176.    Public policy mandates protections for survivors of Domestic Violence and persons with trauma-based disabilities in all public accommodations and employment.

177.    Rules of Professional Conduct (e.g. 8.4(d), 1.14) prohibit conduct that exploits or harms vulnerable individuals, especially where attorneys act with knowledge of their status.

The plaintiff has suffered damages, including:

a.  Loss of profit from copyrighted Intellectual Property;
b.  Suppressing and excluding Plaintiff from advocacy interstate sponsorship markets;
c.  Loss of digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d.  Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e.  Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media and grant proposals across state lines.
f.  Loss of paralegal reputation;
g.  Loss of nonprofit funding and sponsorship;
h.  Extreme emotional distress, anxiety, and fear for her safety.

## COUNT VII: COLLUSION, CIVIL CONSPIRACY, AND COORDINATED MISCONDUCT ANTITRUST LAWS (SHERMAN ACT) 18 U.S.C. § 241/242 18 U.S.C. § 371

178.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

179.    Plaintiff, Medico, disclosed or was known to be a survivor of domestic abuse/violence, child neglect, child abuse, and foster care.

180.    Defendants intentionally created instability by manufacturing a malicious statement to have her terminated from her employment, to have her focus on obtaining new

42

employment, and not on the fact that they were taking over Plaintiff's compilation of research, legal advocacy, and creative academic writing.

181.    Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment - to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the employer knew that James Brownstein, Esq. authored the letter himself acting as fiduciary for Plaintiff for the purpose of maligning her position, reputation, and/or Intellectual Property.

182.    Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

183.    Defendants knowingly and willfully colluded to replicate, distribute, and profit from Plaintiff's Personal Story, personal legal experience, court and legal advocacy work, and intellectual work while simultaneously excluding her from recognition and subjecting her to reputational and financial harm.

184.    The agreement among Defendants included a shared objective to profit from Plaintiff's Original Personal Story, academic and legal advocacy work, advance careers and brands, and delegitimize Plaintiff as the original author.

185.    Defendants coordinated acts of content replication, refusal to provide attribution, dissemination through news media on all platforms, and online harassment, which constitute a civil conspiracy under Connecticut common law and public policy.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy interstate sponsorship markets;
c. Loss of digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media and grant proposals across state lines.
f. Loss of paralegal reputation;
g. Loss of nonprofit funding and sponsorship;
h. Extreme emotional distress, anxiety, and fear for her safety.

## COUNT VIII — TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

186.   All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

187.   Plaintiff, Medico, maintained valid and existing business relationships and business expectancies with multiple entities, including but not limited to: her employer Neubert, Pepe & Monteith ("NPM"), sponsors, philanthropic grant-makers, academic collaborators, nonprofit partners, advocacy networks, media platforms, speaking venues, digital spaces, and national organizations that recognized her Original Personal Story, academic research, and nonprofit advocacy work as valuable in the domestic violence and child abuse survivor movement.

188.   Plaintiff had a reasonable probability of future economic benefit arising from existing and prospective relationships with nonprofit funders, sponsors, speaking engagements, potential research collaborations, public education programming, content distribution partners, and survivor-advocacy institutions, including digital media platforms where her original content was published and circulated.

189.   Defendants had actual knowledge of Plaintiff's existing and reasonably expected business relationships and economic expectancies, including her employment with NPM, her nonprofit Sweet Corner Girl Corp., her visibility in advocacy spaces, her Original Academic

Research, her Public Interviews, and her anticipated speaking, strategic partnerships, educational training workshops, and sponsorship opportunities flowing from Plaintiff's Original Advocacy Work.

190.    Defendants knowingly and intentionally engaged in conduct intended to interfere with Plaintiff's ongoing and prospective economic relationships, including but not limited to:

    a.   colluding to create and spread malicious false statements about Plaintiff's character and professional integrity.

    b.   manufacturing false allegations that Plaintiff falsified, misused, or forged her employer's law firm letterhead with intent to defraud, when Defendants knew those statements to be false and manufactured by their own acts when Goodman called Brownstein;

    c.   engaging in reputational attacks and coordinated defamation targeted to destroy Plaintiff's credibility as a domestic violence survivor advocate;

    d.   intentionally isolating Plaintiff from nonprofit advocacy markets, sponsorship networks, and academic programs, and excluding her from spaces where her original research and narrative had previously supplied benefit;

    e.   causing Plaintiff's wrongful termination from NPM by spreading false allegations to attorney Brownstein and others;

    f.   misappropriating Plaintiff's Intellectual Property, academic work, nonprofit content, and Original Personal Story and using it to establish competing economic relationships on behalf of Defendants.

g. undermining existing sponsorship, collaborations, and grant opportunities by presenting Plaintiff's work as their own and erasing her as the Original Source; and

h. using their institutional and professional influence to prevent Plaintiff from securing continued employment, speaking opportunities, and programmatic funding.

191. Defendants' interference was intentional, malicious, and without justification and was committed with the wrongful motive of ending Plaintiff's occupation, destroying her nonprofit advocacy work, and diverting her economic opportunities to themselves.

192. Defendants' acts were accomplished by improper means, including defamation, fraud, misrepresentation, stalking, coordinated pervasive cyberstalking, harassment, obstruction of evidence, intimidation, and unlawful misappropriation of Plaintiff's Intellectual Property for economic gain.

193. As a direct and proximate result of Defendants' intentional and unjustified interference, Plaintiff's existing and prospective business relationships were irreparably damaged.

194. Plaintiff has suffered actual economic loss, including:

a. Loss of profit from copyrighted Intellectual Property;

b. Suppressing and excluding Plaintiff from advocacy interstate sponsorship markets;

c. Loss of digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.);

d. Loss of income, employment, employment opportunities;

    e.   Loss of commercial advantage by repackaging Plaintiff's content into Defendants' workshops, books, media and grant proposals;

    f.   Loss of paralegal reputation and economic value of professional goodwill;

    g.   Loss of nonprofit funding and sponsorship;

    h.   Loss of speaking opportunities, partnerships, curriculum development, and academic advancement; and

    i.   Extreme emotional distress, anxiety, and fear for her safety.

195.    Defendants' conduct constitutes tortious interference with business expectancy under Connecticut common law, and Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees, and all remedies permitted by law.

## COUNT IX - TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

196.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

197.    Plaintiff had a valid and existing employment contract and professional relationship with Neubert, Pepe & Monteith ("NPM"), and contractual business relationships through Sweet Corner Girl Corp. for the distribution of her Academic Research, speaking engagements, and advocacy presentations.

198.    Defendants had actual knowledge of Plaintiff's employment relationship and her contractual and economic benefits flowing from her professional role at NPM and her nonprofit work.

199.    Defendants intentionally and improperly interfered with Plaintiff's contractual relationship by:

    a.   manufacturing a false allegation that Plaintiff forged or misused her employer's letterhead;

    b.   making defamatory statements to attorney Brownstein and others to induce termination;

    c.   concealing the truth that James Brownstein, Esq. authored, edited, signed, and directed the distribution by FedEx of the cease-and-desist letter;

    d.   creating a malicious narrative intended to cause termination despite knowing the allegation was false;

    e.   using intimidation, and threat of legal action to suppress Plaintiff's right to protect her Intellectual Property; and

    f.   coordinating pressure on NPM and its internal decision-makers to retaliate against Plaintiff.

200.    Defendants' actions were committed with the intent and purpose to induce breach, terminate Plaintiff's employment, and prevent Plaintiff from exercising her legal right to defend her Original Academic Research and nonprofit interests.

201.    Plaintiff's employment was terminated as a direct and proximate result of Defendants' wrongful interference.

202.    Defendants' actions were done maliciously, without privilege, and contrary to public policy protecting victims of domestic violence and retaliation.

203.    Plaintiff has suffered actual harm, including:

    a.   Loss of income and wages from employment;
    b.   Loss of paralegal career trajectory;
    c.   Loss of nonprofit funding and sponsorship;
    d.   Loss of digital reach and market value of nonprofit advocacy brand;
    e.   Loss of Intellectual Property profit;
    f.   Reputational harm and emotional distress; and
    g.   Economic damages to Sweet Corner Girl Corp.

204.    Plaintiff is entitled to compensatory and punitive damages under Connecticut law.

**COUNT X  – FRAUD (INTENTIONAL MISREPRESENTATION)**

205.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

206.    At all times relevant, Defendants acted individually and in concert to fabricate, publish, and circulate false statements of fact for the purpose of damaging the Plaintiff's reputation, terminating her employment, suppressing her nonprofit advocacy efforts, and profiting from her Original Personal Story, Academic Research, and Intellectual Property.

207.    Defendants, including, but not limited to, Campos, Marcone, Keller, Cocchiola, Fontes, Polacko, Swithin, Dr. Ramani and Protective Moms,  CFJ, CCADV knowingly made false representations that they were collaborating with Plaintiff on domestic violence advocacy and "workshopping" her original academic content, while concealing that they were collecting and misappropriating Plaintiff's Original Copyright-Protected works for their own use and economic gain.

208.    Defendants falsely represented to Plaintiff that her Academic Research, program materials, and protected content would be used to support a "newsletter," to assist other survivors and not for public advocacy events, and legislative educational efforts—when in fact Defendants intended to hold out Plaintiff's copyright-protected work as their own, present it without attribution, and substitute themselves as the original authors and authorities.

209.    Defendants subsequently fabricated a malicious, false statement that Plaintiff had falsified or improperly used attorney James Brownstein's law firm letterhead to author a cease-and-desist letter, when in fact Mr. Brownstein authored, edited, signed, and directed the transmission of the letter himself to an employee other than Plaintiff.

210.    Defendant Emily Goodman, Esq., acting in concert with Protective Moms and related Defendants, knowingly colluded to manufacture and disseminate that false claim to Plaintiff's employer for the purpose of causing Plaintiff's termination, and with actual knowledge that the statement was untrue.

211.    Defendants made these false statements with full knowledge of their falsity, and with the intent that third parties—including Plaintiff's employer NPM, professional contacts, and the advocacy community—rely upon those false statements to Plaintiff's detriment.

212.    Defendants also made false representations to Hearst and reporter Dignan, by presenting Plaintiff's Original Academic Research and Original Personal Story as their own, with fabricated claims of research lineage and authorship, resulting in the publication of Plaintiff's protected material under the byline of Defendant Dignan.

213.    Defendants further falsely represented to the public, state government leaders, and granting entities that their published materials, workshops, and interviews were based on their original research, when in fact they were based on Plaintiff's Original Copyright-Protected Content, presented without credit.

214.    Defendants' false statements were deliberately made to induce reliance by:

a.      Plaintiff, by gaining access to her Intellectual Property and suppressing her objections;

b.      NPM, to facilitate her wrongful termination;

c.      Hearst and its reporters, to publish Plaintiff's work under Defendants' names;

d.      Members of the advocacy ecosystem, to adopt Defendants as the source of Plaintiff's research; and

e.      Public institutions, grant-makers, and sponsors, to channel economic benefit to Defendants.

215.   Defendants' false statements and concealment were intended to:

(i) destroy Plaintiff's credibility,
(ii) erase her authorship,
(iii) exclude her from the nonprofit advocacy markets, and
(iv) allow Defendants to profit from her work.

216.   Plaintiff and third parties, including her employer, staff at NPM, advocacy networks, sponsors, grant-makers, and media platforms, reasonably relied on Defendants' false representations.

217.   Plaintiff reasonably relied on representations made to her by Campos and Marcone, who held themselves out as survivors of domestic violence seeking collaborative advocacy, without disclosing their participation in advertising and marketing in association with Keller, Cocchiola, Polacko, Swithin, Dr. Ramani, Dignan, Hearst, Fitch, Protective Moms, CCADV, Stakeholders, and Sponsors, and the planned misappropriation.

218.   NPM's decision to terminate Plaintiff's employment was based on the false narrative that Plaintiff falsified law firm letterhead, which was expressly fabricated to create the appearance of misconduct and induce termination.

219.   Hearst, Dignan, Connecticut Insider, and Fitch relied on representations that Defendants were the original source of Plaintiff's academic work, leading to the publication of Plaintiff's content under Defendants' names.

220.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff sustained significant injury, including but not limited to:

**Economic Losses**

a. Loss of profit from copyrighted Intellectual Property;
b. Exclusion from advocacy sponsorship markets;
c. Loss of employment, wages, and professional advancement at NPM;
d. Loss of nonprofit funding, reach, and platform visibility (Clubhouse, Instagram, YouTube, podcasts, etc.);
e. Loss of commercial advantage from Defendants' repackaging of Plaintiff's content into

workshops, books, media, and grant proposals;
f. Loss of paralegal reputation and goodwill.

**Personal and Reputational Harm**
g. False defamatory statements damaging Plaintiff's professional reputation;
h. Emotional distress, trauma-related injury, and fear for her safety;
i. Loss of access to advocacy opportunities and educational advancement.

221.    Defendants' acts were intentional, malicious, and committed with reckless disregard for Plaintiff's rights as the Original Author and Owner of the Copyright-Protected Material.

222.    Plaintiff is entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs, and any other relief the Court deems just and proper.

## COUNT XI: VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA, CONN. GEN. STAT. § 42-110a et seq.)

223.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

224.    Plaintiff is a consumer and producer of intellectual services, educational advocacy, and nonprofit programming within the stream of commerce.

225.    Defendants' actions, including false designation of origin, appropriation of business goodwill, unauthorized use of nonprofit identity and content, constitute unfair competition and deceptive practices in violation of CUTPA.

226.    The conduct has caused ascertainable losses to Plaintiff, including reputational injury, lost donations, lost opportunities, loss of higher education, interference with economic relationships, and severe emotional distress.

227.    Defendants' violations were intentional, immoral, unethical, and unscrupulous. The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

**COUNT XII: <u>VIOLATION OF THE VIOLENCE AGAINST WOMEN ACT (VAWA), 34 U.S.C. § 12291 et seq. STALKING AND RETALIATION 34 U.S.C. § 12291(a)(1)(A), (2022 REAUTH.) and CONN. GEN. STAT. § 46A-60(B)(4)</u>**

228.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

229.    Plaintiff, Medico, disclosed and was known to be a survivor of domestic abuse/violence, child abuse, and foster care by all parties.

230.    All Defendants knew Medico was a survivor of isolation, neglect, abuse, and violence, and due to her status as a survivor of child neglect/abuse and domestic abuse/violence, is particularly vulnerable and identified as a protected class.

231.    All Defendants knew of Plaintiff's protected class status.

232.    Defendants Brownstein and NPM were in a fiduciary position of trust and representation with respect to the Plaintiff, Medico.

233.    Defendants, Brownstein & Angie DiDomenico (Neubert Pepe & Monteith PC) knowingly terminated Plaintiff while she was being stalked by Campos, Cocchiola, Fontes, Keller, Swithin, Dr. Ramani, Protective Moms, CFJ. CCADV, Goodman, Akin Gump, and Plaintiff is a victim of gender-based violence, cyberstalking, and workplace retaliation that arose from efforts to seek protection from abuse.

234.    Defendants fabricated an allegation of unauthorized use of letterhead despite James Brownstein, Esq. having authored, edited, signed, and directed its distribution to an employee other than Plaintiff.

235.    Defendants failed to intervene or document reasonable accommodations for PTSD, contrary to CFEPA obligations as a trusted fiduciary representative after authoring and distributing a cease-and-desist letter on October 27, 2021.

236.    Defendants participated in isolating Plaintiff by mischaracterizing her conduct and eroding internal and external support.

237.    Defendants intentionally created instability by manufacturing a malicious statement to have her terminated from her employment, to have her focus on obtaining new employment, and not on the fact that they were taking over Plaintiff's Compilation Of Research, Legal Advocacy, and Creative Academic Writing.

238.    Defendants coordinated harassment that included a pattern of stalking, surveillance, exploitation, and fabrication of claims to Plaintiff's employer and other third parties, resulting in wrongful termination, reputational injury, and further trauma.

239.    Defendants continue to stalk Plaintiff on social media platforms to witness the effects of the harm that the slander, defamation, theft, and use of Plaintiff's work while claiming and crediting as their own researched work.

240.    Such acts are prohibited under the civil provisions of VAWA and Connecticut public policy, which protects victims from retaliation, employment-related consequences, and systemic deprivation of safety and privacy rights.

241.    Defendants retaliated or excluded her from protected spaces or opportunities.

242.    Emily Goodman and Akin Gump used institutional authority to silence Plaintiff's advocacy and prevent her from continuing trauma-based work.

243.    Defendants suppressed her work in professional networks after knowing she was a domestic violence survivor and had PTSD.

244.    Defendants' participation and validation of false narratives facilitated reputational and professional isolation.

245.    Public policy mandates protections for survivors of Domestic Violence and persons with trauma-based disabilities in all public accommodations and employment.

246.    Rules of Professional Conduct (e.g. 8.4(d), 1.14) prohibit conduct that exploits or harms vulnerable individuals, especially where attorneys act with knowledge of their status. The plaintiff has suffered damages, including:

a.  Loss of profit from copyrighted Intellectual Property;
b.  Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c.  Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d.  Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e.  Loss of profit from speaking engagements and presentation opportunities
f.  Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g.  Loss of paralegal reputation;
h.  Loss of nonprofit funding and sponsorship;
i.  Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XIII: FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER THE LANHAM ACT (15 U.S.C. § 1125(a))

247.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

248.    Defendants used Plaintiff's original creative expressions, academic research, academic conclusions, court advocacy framework, and nonprofit themes in commerce without attribution, implying origin with or endorsement of Medico by Defendants.

249.    Defendants marketed content through digital platforms, news outlets, and

affiliated entities under misleading representations that damaged Plaintiff's goodwill and brand.

250.    These actions constitute false designation of origin and unfair competition under

the Lanham Act, misleading the public and diverting recognition and academic, employment,

advocacy, and speaking opportunities from Plaintiff.

The plaintiff has suffered damages, including:

a. Loss of profit from copyrighted Intellectual Property;
b. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e. Loss of profit from speaking engagements and presentation opportunities
f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g. Loss of paralegal reputation;
h. Loss of nonprofit funding and sponsorship;
i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XIV: INVASION OF PRIVACY / FALSE LIGHT / PUBLIC DISCLOSURE OF PRIVATE FACTS

251.    Defendants knowingly and publicly disseminated private, sensitive, and

misleading information about Plaintiff without her consent.

252.    The publication of such material cast Plaintiff in a false light and exposed her

further to public shame, ridicule, and humiliation.

253.    The acts complained of were not newsworthy, and the disclosure of private facts

and mischaracterizations was done with actual malice or reckless disregard for the truth to harm

the Plaintiff and create false impression of the Plaintiff's integrity.

254.    On March 6, 2025, Cocchiola sent an email to other participants to whom she sold

and disseminated the Plaintiff's Intellectual Property, stating the following excerpt:

**"To be clear:** I have never met Gina Medico, nor did I know who she was prior to November 2024.

In October of 2021 I presented a workshop coordinated by CT Protective Moms with Evan Stark, PhD, Lisa Fontes, Ph.D, and a lawyer among a few other speakers. The purpose of the workshop was to educate on the newly passed Jennifers' Law in Connecticut.

Apparently, after that event, all of us received a **Cease and Desist** from Ms. Medico. I was hardly aware of it as the issue quickly went away for reasons detailed below. Her accusations were:

Stealing content from her business: Sweet Corner Girl Corporation.

It was determined at that time that Gina Medico, a paralegal, had used her employer's letterhead for the Cease and Desist Order. The employer did not approve her use of his letterhead. The **Cease and Desist** Order was dropped. Fast forward to the publication of **FRAMED:** *Women in the Family Court Underworld.* Gina began posting online that I had stolen her content on "coercive control" and that if she was "unalived," people should look to me. Keep in mind: **FRAMED** is a 22 stories of protective mothers. I did write the introduction and explain coercive control. Perhaps she believes I stole this from her. Additionally, Amy Polacko received a **Cease and Desist** and Ms. Medico began writing defamatory comments about her also.

Gina sent a second **Cease and Desist** in November of 2024 andhas periodically reached out to advocacy groups and podcasts that I have guested on or Amy and I have guested on @**FRAMED**. Her intent is apparent - to intimidate advocates and podcasters with the **Cease and Desist.**

The police have been less than helpful. Amy and I chose to take a step back and replied to Gina Medico with the support of an attorney. She has disregarded our concerns, however we were hopeful things would simply quiet down. Now, this third **Cease and Desist.**

*So again, I am so sorry. I am going to follow up with the police. Please know that you are not in any manner complicit in any wrong doing."*

255.    Defendants intentionally created instability by manufacturing a malicious statement to have her terminated from her employment, to have her focus on obtaining new employment, and not on the fact that they were taking over Plaintiff's Compilation of Research, Legal Advocacy, and Creative Academic Writing.

256.    Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the employer knew that Brownstein authored the letter himself acting as fiduciary for Plaintiff for the purpose of maligning her position in her employment, community, reputation, and/or Intellectual Property.

257.    Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

258.    Defendants' conduct led to Plaintiff's termination, unlawful discrimination, and willful disregard of Plaintiff's federal and state-protected rights.

259.    Plaintiff suffered significant emotional distress, reputational harm, and mental anguish as a direct result.

The plaintiff has suffered damages, including:

a.  Loss of profit from copyrighted Intellectual Property;
b.  Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
c.  Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
d.  Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
e.  Loss of profit from speaking engagements and presentation opportunities
f.  Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
g.  Loss of paralegal reputation;
h.  Loss of nonprofit funding and sponsorship;
i.  Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XV: DEFAMATION PER SE AND SLANDER

260.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

261.    Defendants colluded with their associates-in-fact and made false, defamatory, and damaging statements to third parties, including Plaintiff's employer and associates, alleging unethical conduct, mental instability, and professional misconduct.

262.    These statements were knowingly false or made with reckless disregard for the truth and were intended to, and did in fact, with the intent to cause substantial harm to Plaintiff's reputation and employment.

263.    Defendants communicated these statements orally (slander) and in written formats (defamation), including digital correspondence and through social and professional networks.

264.    Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the employer knew that Brownstein authored the letter himself for the improper purpose of misappropriating her position, reputation, and/or Intellectual Property.

265.    Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

266.    Defendants' conduct led to Plaintiff's termination, unlawful discrimination, and willful disregard of Plaintiff's federal and state-protected rights.

267.    Defendants continued to stalk Plaintiff on social media platforms to witness the effects of the harm that the slander, defamation, theft, and use of Plaintiff's work while claiming and crediting as their own researched work.

268.    Defendants intentionally created instability by manufacturing a malicious statement to have her terminated from her employment, to have her focus on obtaining new employment, and not on the fact that they were taking over Plaintiff's Compilation of Research, Legal Advocacy, and Creative Academic Writing and Advocacy Platform.

As a direct and proximate result of the defamation, Plaintiff suffered:

j. Loss of profit from copyrighted Intellectual Property;
k. Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
l. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
m. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
n. Loss of profit from speaking engagements and presentation opportunities
o. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
p. Loss of paralegal reputation;
q. Loss of nonprofit funding and sponsorship;
r. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XVI: VIOLATION OF THE DEFEND TRADE SECRETS ACT (DTSA), 18 U.S.C. § 1836 et seq., and CONNECTICUT UNIFORM TRADE SECRETS ACT (CUTSA), Conn. Gen. Stat. § 35-50 et seq.

269.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

270.    Plaintiff Medico is the creator and sole owner of proprietary academic research, nonprofit programming materials, and survivor-advocacy frameworks, developed through personal trauma experiences, legal court advocacy, and Original Academic Coursework for her criminal justice degree through Bay Path University.

271.    These materials include, but are not limited to:

      a.      Original essays analyzing patterns of domestic abuse, violence and coercive control;

      b.      Strategic advocacy templates for training law enforcement, attorneys, and courts;

      c.      Original press releases, workshop designs, and program curricula authored solely by Plaintiff;

      d.      Personal trauma-based narratives and advocacy concepts are embedded into her nonprofit website, essays, research, and speeches.

272. These materials derive independent economic value from not being generally known to, or readily ascertainable through proper means by, others in the field of domestic violence advocacy, including competing nonprofit entities, academic professionals, and media.

273. Plaintiff took reasonable measures to maintain the secrecy and exclusivity of this material, including limiting access to collaborators under false pretenses (e.g., Marcone, Campos), restricting distribution to nonprofit use, and formally issuing cease-and-desist letters to unauthorized users on or about October 27, 2021, February 25, 2022, November 17, 2024, November 29, 2024, March 5, 2025 and May 9, 2025.

274. Defendants, including Campos, Marcone, Dignan, Cocchiola, Fontes, Keller, Polacko, Dr. Ranami, Donohue, and others, misappropriated Plaintiff's trade secrets by:

      a.  Acquiring materials through deception or breach of confidential trust relationships;

      b.  Knowingly disclosing and using the materials for commercial presentations (e.g., October 21, 2021, workshop), published articles (e.g., Dignan's December 2021 Hearst piece, Fitch's May 2023 piece), and educational programs;

      c.  Disseminating content through national platforms, media publications, and advocacy groups without authorization, attribution, or compensation;

    d.  Reframing the Plaintiff's Proprietary Legal and Academic Frameworks as their own and profiting therefrom.

275.    Upon information and belief, these actions were taken after Defendants were placed on formal notice via a cease-and-desist letter authored by Plaintiff's employer and attorney, James Brownstein, Esq. on October 27, 2021, and continued despite the notice.

276.    The actions described above constitute "misappropriation" under 18 U.S.C. § 1839(5) and Conn. Gen. Stat. § 35-51(b), in that Defendants acquired, disclosed, or used trade secrets of Plaintiff without express or implied consent, and by improper means.

277.    Defendants' conduct was willful, malicious, and undertaken with Actual Knowledge of Plaintiff's Ownership, as they had access to academic essays, website drafts, Zoom meetings, and original workshop materials provided in confidence.

As a direct and proximate result of the misappropriation, Plaintiff has suffered:

    a.    Loss of control over her Intellectual Property;

    b.    Loss of nonprofit funding and sponsorship;

    c.    Loss of future contracts and media opportunities;

    d.    Severe reputational harm and extreme emotional distress.

278.    Plaintiff is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A) and Conn. Gen. Stat. § 35-52(a), as the use and dissemination of her trade secrets continues to threaten ongoing irreparable harm.

279.    Plaintiff is further entitled to monetary damages for actual loss and unjust enrichment under 18 U.S.C. § 1836(b)(3)(B) and Conn. Gen. Stat. § 35-53(a), as well as exemplary damages and attorney's fees due to the willful and malicious nature of Defendants' conduct under 18 U.S.C. § 1836(b)(3)(C)–(D) and Conn. Gen. Stat. § 35-53(b).

**COUNT XVII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

280.     All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

281.     Defendants' conduct was extreme, outrageous, and intended to cause Plaintiff permanent emotional, psychological, reputational, and professional harm.

282.     Defendants' conduct was intentional, pervasive, and targeted Plaintiff based on knowing Plaintiff's history of trauma.

283.     Defendants ignored prior warnings when Plaintiff asked for protection from monitoring, stalking, and isolation.

284.     Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the it was known that Brownstein authored the letter himself for the improper purpose of maligning her position, reputation, and/or Intellectual Property.

285.     Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

286.      Defendants' conduct led to Plaintiff's termination, unlawful discrimination, and willful disregard of Plaintiff's federal and state-protected rights.

287.     Defendants had prior knowledge that the conduct and behaviors were malicious, extreme, outrageous, and intended to cause Plaintiff emotional, psychological, reputational, and

professional harm, and failed or refused to provide reasonable accommodations or protections to prevent further harm.

As a direct and proximate result of defendant's actions, Plaintiff suffered damages:

   a.  Loss of profit from copyrighted Intellectual Property;
   b.  Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;
   c.  Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)
   d.  Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;
   e.  Loss of profit from speaking engagements and presentation opportunities
   f.  Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.
   g.  Loss of paralegal reputation;
   h.  Loss of nonprofit funding and sponsorship;
   i.  Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XVIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

288.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

289.    Defendants had prior knowledge that Defendant's conduct and behaviors were extreme, outrageous, and intended to cause, or with reckless disregard would cause, Plaintiff permanent emotional, psychological, reputational, and professional harm, and failed or refused to provide reasonable accommodations necessary to ensure equal access to services or protections to prevent further foreseeable harm.

290.    All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

291.    Defendants' conduct was extreme, outrageous, and intended or reasonably foreseeable to cause Plaintiff permanent emotional, psychological, reputational, and professional harm.

292.    Defendants' conduct was intentional, pervasive, and targeted Plaintiff based on knowing Plaintiff's history of trauma.

293.    Defendants ignored prior warnings when Plaintiff asked for protection from monitoring, stalking, and isolation.

294.    Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the it was known that Brownstein authored the letter himself for the improper purpose of maligning her position, reputation, and/or Intellectual Property.

295.    Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

296.    Defendants' conduct led to Plaintiff's termination, unlawful discrimination, and willful disregard of Plaintiff's federal and state-protected rights.

297.    Defendants had prior knowledge that the conduct and behaviors were malicious, extreme, outrageous, and intended or reasonably forseeable to cause Plaintiff emotional, psychological, reputational, and professional harm, and failed or refused to provide reasonable accommodations or protections to prevent further harm.

As a direct and proximate result of the defamation, Plaintiff suffered:

a.  Loss of profit from copyrighted Intellectual Property;
b.  Suppressing and excluding Plaintiff from advocacy in interstate sponsorship markets;

   c. Loss of non-profit reach and digital platform reach (Clubhouse, Instagram, YouTube, podcasts, etc.)

   d. Loss of income, employment, employment opportunities, research, educational and advocacy opportunities;

   e. Loss of profit from speaking engagements and presentation opportunities

   f. Loss of commercial advantage by repackaging Plaintiff's copyrighted content into their own workshops, books, media, and grant proposals across state lines.

   g. Loss of paralegal reputation;

   h. Loss of nonprofit funding and sponsorship;

   i. Extreme emotional distress, anxiety, and fear for her safety with the knowledge of being stalked.

## COUNT XIX: DISABILITY DISCRIMINATION (PTSD) IN VIOLATION OF AMERICANS WITH DISABILITY AT, 42 U.S.C. §12101 AND CONN. GEN. STAT. §§46a-51(20)

298. All preceding allegations are hereby realleged and incorporated in this Count as if fully set forth herein.

299. Plaintiff was fully qualified to perform the essential functions of her position with or without reasonable accommodations.

300. Plaintiff's disability was a motivating factor of Defendant's decision to take one or more adverse employment actions against her, including terminating her, changing the terms and conditions of her employment, and holding her to different standards than her non-disabled co-workers.

301. Defendant's violation of the CFEPA was willful and/or reckless disregard for Plaintiff's right to be free from disability discrimination, harassment, and abusive behavior after being notified that abuse was occurring.

302. Defendants misused internal complaint and disciplinary processes for improper purposes, including retaliatory termination.

303. Defendants misused and assigned the disciplinary processes against Plaintiff and specifically excluded Plaintiff from the process.

304.     Plaintiff was retaliated against for opposing such stalking, cyber stalking, intentional exclusion, harassment, isolation, and abuse.

305.     Defendants allowed or conspired with one or more individuals – who stood to gain financially or professionally from Plaintiff's termination – to exploit the internal reporting mechanisms at her employment to fabricate a malicious accusation that Plaintiff wrongfully used the letterhead of her employer to send a cease-and-desist, when the employer knew that Brownstein authored the letter himself for the improper purpose of misappropriating her position, reputation, and/or Intellectual Property.

306.     Upon information and belief, the same individuals who instigated Plaintiff's termination engaged in theft, fraud, or diversion of Plaintiff's professional materials, nonprofit initiatives, and donor or funding networks – thereby revealing their improper motive in triggering Plaintiff's termination through discriminatory means, bad faith manipulations of workplace systems to enable theft and self-enrichment.

307.     Defendants' conduct led to Plaintiff's termination, unlawful discrimination, and willful disregard of Plaintiff's federal and state-protected rights.

308.     As a result of Defendant's unlawful conduct, as aforesaid, Plaintiff has sustained lost wages, non-discretionary wages and bonuses, and benefits of employment, has been deprived of the benefits of gainful employment in the future, has sustained substantial emotional distress, and has incurred or will incur attorneys' fees and costs.

As a direct and proximate result of the discrimination, Plaintiff suffered:

    a.   Loss of nonprofit reputation and funding;
    b.   Loss of control over her nonprofit brand and speech;
    c.   Lost future speaking engagements and collaboration opportunities;
    d.   Reputational injury and emotional distress;
    e.   Economic harm to her nonprofit and advocacy platform.
    f.   Plaintiff is entitled to actual damages, unjust enrichment, exemplary damages, attorneys' fees, and injunctive relief.

**WHEREFORE,** Plaintiff Medico respectfully requests that this Court enter judgment in favor of Plaintiff as follows:

a.  Award compensatory and punitive damages;

b.  Award treble damages pursuant to 18 U.S.C. § 1964(c);

c.  Order return or destruction of any proprietary content still in possession of Defendants;

d.  Injunctive relief enjoining Defendants from further use or dissemination of Plaintiff's trade secrets 18 U.S.C. § 1836(b)(3)(A) and Conn. Gen. Stat. § 35-52(a),

e.  Grant such further relief as the Court deems just and proper.

f.  Compensatory damages for actual loss and unjust enrichment;

g.  Exemplary damages up to twice the amount of actual damages;

h.  Any further relief the Court deems just and proper.

i.  Award statutory and treble damages under VAWA and CUTPA;

j.  Order disgorgement of profits derived from misappropriated work;

k.  Grant a declaratory judgment acknowledging Plaintiff as the originator of the content;

l.  Enjoin Defendants from further use or dissemination of Plaintiff's protected materials;

m.  Trial by Jury.

n.  Award attorneys' fees, costs, and other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated this ___11th___ day of December 2025 in Bristol, Connecticut.

Gina Medico
Plaintiff Pro Se
268 Farmington Ave., 1st Floor
Bristol, CT 06010
(941) 320-6131
gmedico1@email.com

68

## **VERIFICATION**

I am the Plaintiff in the above-captioned matter.

I have read the foregoing Complaint, and (after a reasonable inquiry) believe (i) it is not being presented for any improper purpose (such as to harass, cause unnecessary delay, or needlessly increase litigation cost); (ii) the legal contentions therein are warranted by existing law or a non-frivolous argument to change or extend the law; (iii) the factual contentions have — or with further investigation will have — evidentiary support; (iv) any denials of factual contentions are warranted on the evidence or a reasonable belief after investigation.

I declare under penalty of perjury that the facts alleged are true and correct to the best of my knowledge, information, and belief, formed after a reasonable inquiry under the circumstances.

Dated this 11th day of December 2025 in Bristol, Connecticut.

Gina Medico
Plaintiff Pro Se
268 Farmington Ave., 1st Floor
Bristol, CT 06010
(941) 320-6131
gmedico1@email.com

On this day, Gina Medico, personally appeared before me Katherine Pawlak. and signed the foregoing Complaint and took an oath that the facts alleged are true and correct after reasonable inquiry under the circumstances.

Sworn and subscribed to on this 11 day of December 2025.

Notary Public/Commissioner of Court

KATHERINE L PAWLAK
Notary Public, State of Connecticut
My Commission Expires Feb 28, 2029